11 CV 3237

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x

LAWRENCE C. GLYNN,

          Plaintiff,

   -against-

CALPINE CORP.,

          Defendant.
--------------------------------------------------------------x

Case No.:  11 Civ.  (   )

**COMPLAINT**

RECEIVED
MAY 12 2011
U.S.D.C. S.D.N.Y.
CASHIERS

     Plaintiff, Lawrence C. Glynn ("Glynn"), complaining of the Defendant alleges upon information and belief, as follows:

### Parties

    1.    Plaintiff, Lawrence C. Glynn is a resident of the County of Queens in the City and State of New York.

    2.    Defendant, Calpine Corp. (hereinafter "Calpine"), is a corporation and/or other business entity existing under and pursuant to the laws of the State of Texas with an office and place of business at 717 Texas Avenue, Suite 1000, Houston, TX 77002.

### Jursidiction

    3.    This Court has diversity jurisdiction pursuant to 28 U.S.C. §1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000.00.

    4.    This is an action to recover plaintiff's reasonable attorney's fees in accordance with a prior order of this Court dated June 9, 2009.

    5.    This Court also has jurisdiction pursuant to 28 U.S.C. §158(a)(1) as the instant dispute arises from an underlying decision of this Court in a matter which was on appeal from a

decision of the Bankruptcy Court dated September 26, 2008 and order of that court dated September 30, 2008 granting defendant's motion for summary adjudication on and discharging claims numbered 6309, 6314, 6315, 6316, 6327 and 6328 [*In re Calpine Corp., et al.*, Case No. 05-B-60200(BRL)].

## Background

6.    A detailed substantive and procedural history of the underlying bankruptcy action is set forth in the Decision and Order of this Court dated June 9, 2009 ("Decision and Order") which is annexed hereto as Exhibit A and is hereby incorporated by reference.

7.    In the Decision and Order, this Court ruled that "[b]ecause the Court has determined that Calpine breached the Agreement for Purchase such that SAI Trust should be granted summary judgment and Calpine should be denied summary adjudication on the issue of the use of the Allocated Expenses line item, SAI Trust is entitled to attorneys' fees and other costs with respect to the litigation of this issue." See Decision and Order at p 28.

8.    Following the Decision and Order, defendant improperly filed a Notice of Appeal to the Second Circuit Court of Appeals.

9.    Shortly thereafter, in or about September 2009, Plaintiff departed his prior firm to form a new firm, Caruso Glynn, LLC.

10.    At that time, Plaintiff entered into an agreement with SAI Trust to continue handling the matter against Calpine on a contingency fee basis of 22.5% of any amount recovered.

11.    On January 19, 2010, Calpine was willing to enter an offer of judgment in the amount of $850,000.00.

12.    Thereafter, in or about May 2010, SAI and Calpine settled the matter.

2

13.     Upon information and belief, the amount of the settlement between SAI and Calpine was $850,000.00

### First Cause of Action

14.     At all times relevant, Plaintiff was a third-party beneficiary of the contract entered into between SAI and Calpine.

15.     For his efforts in enforcing the terms of the Agreement between Calpine and SAI, and as SAI was undoubtedly the prevailing party, Plaintiff is therefore entitled to his reasonable attorney's fees of 22.5% of the settlement, which is $191,250.00.

16.     To date, Calpine has not paid these attorney's fees, despite the specific Order of this Court that it was contractually obligated to pay same.

17.     Calpine has chosen in bad faith to ignore and violate the terms of this Court's clear Decision.

18.     In light of the foregoing, Plaintiff has suffered damages in the amount of $191,250.00

### Second Cause of Action

19.     Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs "1" through "18" as though more fully set forth herein at length.

20.     Defendant has acted in bad faith, vexatiously, wantonly or for oppressive reasons in refusing to abide by the Decision and Order of this Court and failing to pay reasonable attorneys' fees as prescribed therein.

21.     As a result, Plaintiff has been damaged in the amount of $191,250.00.

22.     Additionally, in light of the bad faith of Defendant aforesaid, Plaintiff shall be awarded reasonable attorney's fees associated with this action.

3

WHEREFORE, plaintiff requests:

(a)    That process in due form of law may issue against Defendant citing them to appear and answer all and singular the matters aforesaid;

(b)    That judgment may be entered in favor of Plaintiff against Defendants on the First Cause of Action for the amount of $191,250.00;

(c)    That judgment may be entered in favor of Plaintiff against Defendants on the Second Cause of Action for attorneys' fees associated with this action in an amount to be determined at the conclusion of these proceedings, and

(d)    That this Court will grant to Plaintiff such other and further relief as may be just and proper, including an award of prejudgment interest and costs.

Dated: New York, New York
         May 12, 2011

Yours, etc.,

**CARUSO GLYNN, LLC**
Attorneys for Plaintiff
*Lawrence C. Glynn*

By: _____
    Lawrence C. Glynn
    36 Peck Slip
    New York, New York 10038
    (718) 570-3338
    File No.:    88.071108.01

4

# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------X
In re                           :

CALPINE CORP. et al.,           :

                                :

          Debtor-Appellee.      :
--------------------------------:
ROBERT MEMBRENO as trustee      :
of SAI TRUST,                   :
                                :
          Appellant,            :
                                :
   -  against  -                :
                                :
CALPINE CORP. et al.,           :
                                :
          Appellees.            :
--------------------------------X

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 6-9-09

Chapter 11 Case
No. 05-B-60200(BRL)
Jointly Administered

District Court
08 Civ. 9797 (VM)

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

In this appeal from a decision of the Bankruptcy Court, claimant-appellant is Robert Membreno, as trustee of the SAI Trust (referred to as "SAI Trust"). Debtors-appellees are Calpine Corporation and its affiliated reorganized debtors (collectively, "Calpine"). SAI Trust appeals from the Bankruptcy Court's memorandum decision dated September 26, 2008 and order dated September 30, 2008 granting Calpine's motion for summary adjudication on and discharging claims numbered 6309, 6314, 6315, 6316, 6327, and 6328, and denying SAI Trust's motion for summary adjudication on those claims.

For the reasons stated below, the decision and order of the Bankruptcy Court are REVERSED in part and AFFIRMED in part.

# I. BACKGROUND

A.   FACTUAL BACKGROUND[1]

1.   Agreement for Purchase

In May of 1987, SAI Geothermal, Inc. ("SAI Geothermal") entered into an "Agreement for Purchase and Sale of Asset" (the "Agreement for Purchase") with Freeport McMoran Resource Partners, LP ("Freeport"), through which SAI Geothermal sold to Freeport its interest in a power plant known as West Ford Flat.  (See Agreement for Purchase, A-1048 through A-1118.) The parties also agreed that Freeport would pay SAI Geothermal a monthly payment of 6% of the West Ford Flat plant's net income.   This monthly payment is referred to as the Net Profits Interest ("NPI").    SAI Geothermal subsequently transferred a portion of its right to receive the NPI to SAI Trust, which is entitled to a monthly NPI payment of 4.55% of net income. (See Declaration of Robert Membreno in Support of Motion for Summary Judgment, dated August 12, 2008 ("Membreno Decl."), ¶ 5, A-1033.)    Freeport assigned its rights and obligations under the Agreement for Purchase to the predecessor entity to Calpine in 1990. (See id. ¶ 6, A-1033.)

The parties do not dispute that the term "Project," as used in the Agreement for Purchase, refers to the West Ford

---

[1]   The following facts are derived from the appellate record.  Below, references to the record are indicated by "A-."

Flat power plant.   The Agreement for Purchase defines net income as gross revenues from the West Ford Flat plant minus: (1) "all Project direct operating expenses (excluding depreciation)"; (2) "general and administrative expenses associated with the Project"; (3) "the cost of any Project related capital additions made subsequent to the Date of First Commercial Operation"; and (4) "if the Project or a portion thereof is financed through Project Financing, principal, interest, reserves and any fees payable in respect of project financing."   (Agreement for Purchase, 21, A-1068.)   The Agreement for Purchase defines "Net Profits Interest" as, "with respect to the Project, the right to receive a payment each month ... in an amount equal to 6% of Net Income for the month."   (<u>Id.</u>)

The Agreement for Purchase specifies that the calculation of direct operating expenses and general and administrative expenses shall be governed by "the Accounting Procedure provided in Exhibit F."   (<u>Id.</u>)   Exhibit F is entitled "Accounting Procedure Joint Operations," and lists twelve categories of "Direct Charges," including "Other Expenditures." (Agreement for Purchase, Ex. F at 2-3, A-1105 to A-1106.)  "Other Expenditures" is defined as "[a]ny other expenditure not covered or dealt with in the foregoing provisions of this Section II, or in Section III, and which is

incurred by the Operator in the necessary and proper conduct of the Joint Operations." (Id. 3, A-1106.)

The Agreement for Purchase also requires, within sixty days of the end of each fiscal year, a statement "certified by [Freeport's] chief financial officer showing in reasonable detail the calculation of the Net Profits Interest." (Agreement for Purchase ¶ 1.6, A-1053.) SAI Geothermal, and subsequently SAI Trust, "shall have the right, upon reasonable notice ... to audit [Freeport's] records to determine whether the calculation of the Net Profits Interest during the fiscal year then ended was in accordance with" the Agreement for Purchase. (A-1053 to A-1054.)

## 2. 1989 NPI Statement Explanation

On December 13, 1989, Freeport wrote to SAI Trust with an "explanation of the line items comprising the SAIT-APT Net Profits Interest Statement for the West Ford Flat power plant," attaching a copy of the August 1989 NPI statement. (Letter from Freeport to R.J. Membreno, dated December 13, 1989, A-1122.) The document describes thirteen line items: electric revenue, interest income from overnight deposits, escrow balance, royalty payments, lease operating expenses, overhead, property taxes, capital additions (major construction), capital additions (overhead), capital additions (development capital), project financing, invested capital,

and loan proceeds.   (See id., A-1122 to A-1124.)   Lease operating expenses are described as: "Actual costs incurred in the operation of the Plant.  Labor costs and related payroll burden are limited to those individuals identified as billable under Exhibit F of the Agreement for Purchase and Sale of Asset ...."   (Id., A-1123.)   Overhead is described as: "Computed at 15% of Lease Operating Expenses as specified in the Agreement."   (Id.)

3.   1992 Judgment After Trial

At some point after NPI payments began, a dispute arose between SAI Trust and Freeport, and a trial was held in the California Superior Court for the County of Santa Clara, in the matter of Membreno v. Freeport McMoran Resource Partners, LP, No. 708898.   On May 11, 1992, a judgment (the "1992 Judgment") was entered, ordering that "[w]ith respect to the calculation of Invested Capital" as used to determine NPI payments, defendants could not use Council of Petroleum Accountants Societies, Inc. ("COPAS") percentage rates "to determine the amount of ... overhead with respect to the construction of" the West Ford Flat power plant because those rates "were not a part of the Agreement."   (1992 Judgment 3, A-1328.)

4.   <u>1995 Settlement Agreement</u>

Subsequently, another dispute arose relating to an audit by SAI Trust of the operations of the West Ford Flat power plant for part of 1990 and all of 1991.   In a settlement agreement between Calpine, Freeport, and SAI Trust, dated February 28, 1995 (the "Settlement Agreement"), the parties agreed that

> adjustments be made to previously issued NPI statements prepared by Calpine Geysers, to the manner by which future NPI statements will be prepared, to the payment of net profits found owing to SAI Trust as the result of the 1990 and 1991 audit, and to the payment of net profits for 1992 and thereafter.

(Settlement Agreement 3, A-1316.)   The Settlement Agreement details, among other things, the adjustments to be made to calculations of "Overnight Interest" and "Escrow Balance," as well as changes in debt amortization resulting from a new loan with a lower interest rate.

The Settlement Agreement also states,

> Except as specifically set forth herein, nothing herein shall affect the rights, duties or obligations of SAI Trust and CALPINE in and under the Agreement for Purchase, specifically including, but not limited, to Sections 1.6 and 9.5.   Commencing with the Annual NPI Report for calendar year 1992 and continuing thereafter, CALPINE agrees to prepare said Annual NPI Reports, and all monthly reports, in accordance with the terms of the Agreement for Purchase and this Settlement Agreement; and CALPINE further agrees to make all NPI payments which may accrue in favor of SAI Trust pursuant thereto.

(<u>Id.</u> 8-9, A-1321 to A-1322.)

5.   <u>Consolidation of Calpine Operations</u>

The West Ford Flat plant is located at the Geysers steam field ("the Geysers"), in Sonoma County, California. By 1998, Calpine owned or had interests in four power plants at the Geysers. In 1999, Calpine acquired fourteen plants at the Geysers. Calpine now owns nineteen out of twenty-two power plants at the Geysers site. (<u>See</u> Declaration of Guy Tipton in Support of Calpine's Motion for Summary Judgment, dated August 13, 2008, ¶ 6, A-999.)

In 1999, "Calpine began to streamline and consolidate the operation of the plants and the steam fields into operational areas, and all its Geysers units into one consolidated operation." (<u>Id.</u>) Calpine then "consolidated its operation and business units with the intent to achieve efficiencies and cost savings associated with economies of scale." (<u>Id.</u>)

6.   <u>2001 Changes to NPI Calculations and Certification</u>

Beginning in April 2001 with the NPI statement for January 2001, the NPI statements prepared by Calpine include a line item called "Allocated Expenses." SAI Trust contends that the Allocated Expenses figure relies upon "budgeted figures, as opposed to actual figures," and that the NPI statements containing this line item have included "costs and expenses attributable to facilities other than West Ford Flat which are not properly attributable to West Ford Flat under

7

Agreement for Purchase, as well as damages of $583,698.61. In its reply papers, SAI Trust sought a judgment of $748,824.49, a figure that includes attorneys' fees.

Calpine argued that the Allocated Expenses fell within the direct operating expenses which the Agreement for Purchase permits Calpine to include in its NPI calculations; that only expenses attributable to the West Ford Flat plant are included in the Allocated Expenses line item; and that neither the 1992 Judgment nor the 1995 Settlement Agreement precluded Calpine *from* including such expenses in the NPI calculations. Calpine also argued that SAI Trust could not prove that any damages were proximately caused by Calpine's failure to certify NPI statements.

On September 24, 2008, the Bankruptcy Court heard oral argument and denied SAI Trust's petition for attorneys' fees. On September 26, 2008, the Bankruptcy Court issued a memorandum decision granting Calpine's motion for summary adjudication to discharge the six claims and denying SAI Trust's motion for summary judgment. The Bankruptcy Court applied California law in finding that Section 9.1 of the Agreement for Purchase was "clear and unambiguous on its face" in "call[ing] for the deduction of all 'direct operating expenses' from the calculation of net income." (A-1757) (emphasis in original). The Bankruptcy Court determined that

"the language of section 9.1 is broad enough to encompass overhead costs allocated by [Calpine] to the West Ford Plant." (Id.)   The Bankruptcy Court noted that Exhibit F of the Agreement for Purchase "identifie[d] twelve permissible categories," and that one of those categories was a "catch-all provision" allowing for the deduction of "any expenditure, incurred 'in the necessary and proper conduct of the [West Ford Flat plant].'" (alterations added) (A-1758).   The Bankruptcy Court concluded, "Clearly the overhead allocations deducted by Calpine were 'necessary and proper' to the operation of the West Ford Plant once Calpine began operating the West Ford Plant as a part of the centralized Geysers." (Id.)

The Bankruptcy Court also found that Calpine had not deducted expenses from NPI payments "that were attributable to any plant other than the West Ford Plant." (A-1757.) The Bankruptcy Court observed that SAI Trust's reading of section 9.1 "would result in a windfall to SAI Trust allowing it to avoid application of any direct operating expenses associated with centralized operations and maintenance and properly allocated to the West Ford Plant." (A-1757 to A-1758.)

In addition, the Bankruptcy Court pointed out that SAI Trust "sold its management interest in the West Ford Plant" by signing the Agreement for Purchase, and that there was

11

Group v. Fard, Inc., 133 Cal. App. 4th 1257, 1270 (Cal. Ct. App. 2005).

However, a court applying California contract law may also consider extrinsic evidence regarding contract interpretation, even if it does not find the language of the contract to be ambiguous. "In contrast to many other states, California has a liberal parol evidence rule: It permits consideration of extrinsic evidence to explain the meaning of the terms of a contract even when the meaning appears unambiguous." Foad Consulting Group, Inc. v. Azzalino, 270 F.3d 821, 826 (9th Cir. 2001). Under California law, "the test of admissibility of extrinsic evidence to explain the meaning of a written instrument is not whether it appears to the court to be plain and unambiguous on its face, but whether the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible." Pacific Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 442 P.2d 641, 644 (Cal. 1968); see also Foad Consulting Group, 270 F.3d at 826 (quoting Pacific Gas & Elec., 442 P.2d at 644).

A bankruptcy court's denial of a request to amend a claim is reviewed for abuse of discretion. See In re Enron Corp., 419 F.3d 115, 124 (2d Cir. 2005); In re Calpine Corp., No. 07 Civ. 8493, 2007 WL 4326738, at *3 (S.D.N.Y. Nov. 21, 2007).

15

B.   **APPLICATION**

The Court will first address the Bankruptcy Court's determination that neither the 1992 Judgment nor the 1995 Settlement Agreement have any effect on the issues implicated by SAI Trust's six claims.  The Court will next consider the Bankruptcy Court's conclusion that Calpine's use of the Allocated Expenses line item in calculating NPI payments comports with the Agreement for Purchase, as well as the determination that SAI Trust failed to demonstrate that it suffered damages as a result of Calpine's failure to certify the NPI statements since 2001.  The Court will then address SAI Trust's argument that Calpine has breached the implied covenant of good faith and fair dealing inherent in all contracts.  Finally the Court will consider SAI Trust's request for attorneys' fees.

1.   **1992 Judgment**

The Bankruptcy Court ruled that the 1992 Judgment had "no possible estoppel or preclusive effects" because the 1992 Judgment was handed down "years before [Calpine's] management made the decision to consolidate the operations at the Geysers" and because the disagreement in the 1992 state court action did not address "the method of calculating 'operating expenses' at issue here."  (A-1759.)

"In deciding the preclusive effect of a state court judgment in federal court," a bankruptcy court should apply "the law of the state that rendered the judgment to determine whether the courts of that state would afford the judgment preclusive effect." In re Weiss, 255 B.R. 115, 118 (S.D.N.Y. 2000.) Under California law, a party is precluded from relitigating an issue addressed in an earlier action if the following conditions are met:

> First, the issue sought to be precluded from relitigation must be identical to that decided in a former proceeding. Second, this issue must have been actually litigated in the former proceeding. Third, it must have been necessarily decided in the former proceeding. Fourth, the decision in the former proceeding must be final and on the merits. Finally, the party against whom preclusion is sought must be the same as, or in privity with, the party to the former proceeding.

In re Cantrell, 329 F.3d 1119, 1123 (9th Cir. 2003) (internal quotation marks and citation omitted).

SAI Trust contends that the issue of whether Calpine may use Allocated Expenses in calculating NPI payments was already the subject of the 1992 Judgment because that judgment represents the trial court's rejection of "an attempt by Calpine to unilaterally alter the manner in which NPI was calculated." (Appellant's Br. 24-25.) In the 1992 Judgment, the California Superior Court determined that "[w]ith respect to the calculation of Invested Capital," Calpine's successor, Freeport, had wrongly used COPAS percentage rates in its

calculations. (1992 Judgment 3, A-1328.)  The Superior Court ruled that the COPAS percentage rates "were not a part of the Agreement [for Purchase]" and that Freeport "may not use those COPAS percentage rates to determine the amount of its overhead with respect to the construction" of the West Ford Flat plant. (Id.)  The Superior Court ordered that SAI Trust be paid $58,000.00 in additional NPI payments, based on the "recalculation of the proper overhead attributable to the construction of the project." (Id.)

The Court affirms the Bankruptcy Court's determination on this issue.  The 1992 Judgment concerned sections of the Agreement for Purchase that are not at issue here, and SAI Trust has failed to carry its burden of demonstrating that all of the collateral estoppel factors have been met.  The Superior Court's ruling on the calculation of Invested Capital, which is the subject of what SAI Trust holds out as the relevant portion of the 1992 Judgment, was not a final ruling on the issue of the items that may be used in calculating NPI payments.  Although the SAI Trust characterizes the Superior Court's statement that "the COPAS percentage rates utilized by defendants were not a part of the Agreement [for Purchase]" as a ruling that NPI calculations can be based only on line items or other elements that are explicitly part of the Agreement for Purchase, the Court

18

rejects this interpretation. The 1992 Judgment gives no indication that it addresses the appropriate method for carrying out all facets of NPI payment calculations. The issue of whether the category of Allocated Expenses, as used by Calpine, may be included in NPI calculations was not actually litigated or necessarily decided in the 1992 Judgment. *Ceitrelli*, 32 F.3d at 1175. Therefore, the Bankruptcy Court correctly ruled that the 1992 Judgment has no preclusive effect on this action.

### 2.   1995 Settlement Agreement

In addition to finding no preclusive effect from the 1992 Judgment, the Bankruptcy Court found that the 1995 Settlement Agreement had no possible estoppel or preclusive effect, because the 1995 Settlement Agreement was handed down "years before [Calpine's] management made the decision to consolidate the operations at the Geysers" and because the disagreement in the 1992 state court action did not address "the method of calculating 'operating expenses' at issue here." (A-1759.)

The Court affirms the Bankruptcy Court's determination that the 1995 Settlement Agreement has no preclusive effect in this action. The 1995 Settlement Agreement is not a final judgment on the merits, and the issue of whether the Allocated Expenses line item, as used by Calpine, may be included in NPI calculations was not "actually litigated" or "necessarily

decided" by the 1995 Settlement Agreement.  <u>Cantrell</u>, 329 F.3d
at 1123.

### 3.   <u>Allocated Expenses in NPI Calculations</u>

The Bankruptcy Court determined that Calpine's use of the
Allocated Expenses line item in calculating NPI payments,
which began in 2001, was permissible under the Agreement for
Purchase.  SAI Trust argues that the Bankruptcy Court erred in
interpreting the Agreement for Purchase "to cover 18 plants
that were never contemplated at the time the agreement was
entered into in 1987," as well as in "ignoring the term
'project'" as it was used in the Agreement for Purchase and
"holding that the term 'direct operating expenses' was broad
enough to include expenses derived from these 18 other
plants." (Appellant's Br. 18.)  SAI Trust's argument is based
in part on the course of dealing between the parties in the
period between 1989 and 2001.  Calpine does not address this
argument, and contends that "[t]here is nothing in the
[Agreement for Purchase] that prohibits Calpine from
allocating the West Ford Plant's share of the twelve
categories of expenses in Exhibit F." (Appellee's Br. 13.)

The Court finds that the Bankruptcy Court erred when it
failed to consider the course of dealing between the parties
from 1989 to 2001 in its interpretation of the Agreement for
Purchase.  Under California law, extrinsic evidence may be

used to interpret the terms of a contract if "the offered evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible," Pacific Gas & Elec., 442 P.2d at 644, even if the language of the contract is not ambiguous. See Foad Consulting Group, 270 F.3d at 826. Although the parol evidence rule "generally prohibits the introduction of any extrinsic evidence ... to vary, alter or add to the terms of an integrated written instrument," this does not "prohibit the introduction of extrinsic evidence to explain the meaning of a written contract" when "the meaning urged is one to which the written contract terms are reasonably susceptible." Casa Herrera, Inc. v. Beydoun, 83 P.3d 497, 502 (Cal. 2004) (internal quotation marks and citations omitted).

A course of dealing is "a sequence of conduct concerning previous transactions between the parties to a particular transaction that is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct." Cal. Com. Code § 1303(b). Contract parties' "prior course of dealings may determine the meaning of a contract term or may add an agreed but unstated term." Marin Storage & Trucking, Inc. v. Benco Contracting & Eng'g, Inc., 89 Cal. App. 4th 1042, 1051 (Cal. Ct. App. 2001). The explanation of the NPI statements sent by Calpine's

predecessor to SAI Trust in December 1989, combined with NPI payments from 1989 to 2001 consistent with this explanation, created a course of dealing sufficient to explain the meaning of the contract terms in dispute here. See, e.g., id. (conduct that was consistent across dozens of transactions was a course of conduct incorporating terms of a written agreement into an oral agreement); Insurance Co. of No. Am. v. NNR Aircargo Serv. (USA), Inc., 201 F.3d 1111, 1114 (9th Cir. 2000) ("receipt of 47 identical invoices for 47 separate transactions" was sufficient to establish course of dealing with respect to a term inherent to the type of contract at issue).

The existence of a course of dealing would normally be a question of fact that the Bankruptcy Court would determine in the first instance, but the facts surrounding the course of dealing are not in dispute. This Court may thus interpret the Agreement for Purchase in light of the course of dealing.[2]

When the parties' prior course of conduct is considered, the Court finds that the Agreement for Purchase does not permit the inclusion of the Allocated Expenses line item. The

---

[2]   Although several courts in the Ninth Circuit have held that "[a]n inference of the parties' common understanding that is based upon a prior course of dealing is a question of fact," Insurance Co., 201 F.3d at 1113 (citing In re CFLC, Inc., 166 F.3d 1012, 1017 (9th Cir. 1999)), that conclusion appears to be based upon cases from the Second and Seventh Circuits that do not apply California law. See CFLC, 166 F.3d at 1017 (citing New Moon Shipping Co., Ltd. v. Man B&W Diesel, Ag, 121 F.3d 24, 31 (2d Cir. 1997) (citing Capitol Converting Equip., Inc. v. LEP Transp., Inc., 965 F.2d 391, 395 (7th Cir. 1992)).

meaning of the Agreement for Purchase suggested by the December 1989 explanation and the NPI payments from 1989 to 2001, with respect to calculation of NPI payments, is that the line items to be included in the NPI calculations were those reflected in the December 1989 explanation and the NPI payments from 1989 to 2001. At the very least, the course of dealing shows that the parties did not contemplate that NPI calculations would include an Allocated Expenses line item reflecting the West Ford Flat plant's share of consolidated business operations expenses. This interpretation is one to which the terms of the Agreement for Purchase are "reasonably susceptible," Casa Herrera, 83 P.3d at 502, in part because at the time the Agreement for Purchase was signed Freeport was not operating the West Ford Flat plant as part of a consolidated enterprise, and Calpine did not begin to consolidate operations at the Geysers until at least 1999, and possibly later.

This course of dealing continued even after Calpine began to acquire interests in other power plants at the Geysers. Calpine contends that by 1999 it owned fourteen plants at the Geysers, and that it began to consolidate its operations at the Geysers that same year. However, Calpine did not add the Allocated Expenses line item to NPI calculations for the West Ford Flat plant until 2001. At no time was there mutual

23

assent to the addition of the Allocated Expenses line item, and the NPI payments from 2001 forward cannot constitute a subsequent course of dealing affecting the interpretation of the Agreement for Purchase because that conduct is not "fairly to be regarded as establishing a common basis of understanding" between the parties. Cal. Com. Code § 1303(b).

The Bankruptcy Court's denial of SAI Trust's motion for summary judgment and grant of Calpine's application for summary adjudication are reversed as to the use of the Allocated Expenses line item in the calculation of NPI payments. The Court notes that the Bankruptcy Court's determination that SAI Trust's damages claim of "over $700,000 in its summary judgment pleading is inappropriate and without justification" (A-1759) is based partly on its finding that there was no breach of the Agreement for Purchase. The Bankruptcy Court did not consider the course of dealing between the parties from 1989 to 2001 in reaching its conclusion. A ruling based upon an erroneous view of the law is an abuse of discretion. See Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 405 (1990). The Court therefore reverses the Bankruptcy Court's denial of SAI Trust's damages claim with respect to the addition of the Allocated Expenses line item beginning in 2001.

The Court does not have information regarding the steps SAI Trust took to contest the change to the NPI payments that occurred in 2001, beyond SAI Trust's assertion in its appellate brief that it brought the matter to Calpine's attention. (See Appellant's Br. 15.) Assuming, however, that SAI Trust has not forfeited its objection to the use of the Allocated Expenses line item, the Bankruptcy Court should determine and award SAI Trust the damages caused by Calpine's inclusion of the Allocated Expenses line items from 2001 forward.

4. **Damages from Failure to Certify NPI Statements**

SAI Trust appeals the Bankruptcy Court's finding that SAI Trust was not able to prove that it suffered damages proximately caused by Calpine's failure to certify NPI statements beginning in 2001. The Bankruptcy Court found that Calpine had "provided SAI Trust with the underlying information necessary to confirm [its] calculations of NPI. Specifically, each month SAI Trust receives financial reports which provide detailed information on, among other things, monthly revenue, monthly interest calculations and costs associated with the West Ford Plant." (A-1759.)

SAI Trust contends that when calculating the Allocated Expenses line item, Calpine has used budgeted or projected expenses "that may or may not have ever been actually

incurred," and that Calpine's failure to annually certify the NPI statements has reinforced or exemplified "the reality that no one on behalf of [Calpine] is willing to ascribe their name to such questionable accounting practices." (Appellant's Br. 38.)   SAI Trust argues that the Agreement for Purchase authorizes it to conduct an audit of the annual certifications, but that it was prevented from conducting any audit of the NPI statements, and thus investigating the basis for the Allocated Expenses line items, when Calpine stopped providing the certifications in 2001.

Although there may be outstanding factual questions regarding the precise composition of the Allocated Expenses line item, the Court affirms the Bankruptcy Court's determination that SAI Trust did not show that it suffered damages proximately caused by Calpine's failure to annually certify the NPI statements.   It is not clear that SAI Trust was actually prevented from carrying out an audit of the records that were provided to it by Calpine, even if those records were not certified.   However, the absence of an audit has not caused damages to SAI Trust; rather, it was the use of the Allocated Expenses line item in the NPI calculations that caused damages to SAI Trust.

5.   Implied Covenant of Good Faith and Fair Dealing

The Bankruptcy Court did not rule on SAI Trust's claim

that Calpine breached the implied covenant of good faith and fair dealing.  Because the Court is not required to resolve any factual disputes to address this claim, the Court will rule on the merits of the implied covenant claim.  See, e.g., In re Treco, 240 F.3d 148, 163 (2d Cir. 2001) (affirming district court's determination of forum clause selection argument that was not addressed by the bankruptcy court); In re Persky, 893 F.2d 15, 17-18 (2d Cir. 1989) (resolving standing claim not addressed by the bankruptcy court).

In its summary judgment papers and in its papers on appeal, SAI Trust argues that Calpine breached the implied covenant when it changed its accounting methods with respect to the West Ford Flat plant, stopped providing certified NPI statements, and used projected or inaccurate figures in its NPI calculations, "all in contradiction to that which was set forth in the Agreement for Purchase."  (A-1402; Appellant's Br. 40.)

Under California law, a claim for breach of the implied covenant of good faith and fair dealing cannot be sustained if the basis for that claim is duplicative of a breach of contract claim.  See Careau & Co. v. Security Pac. Bus. Credit, Inc., 222 Cal. App. 3d 1271, 1395 (Cal. Ct. App. 1990).  SAI Trust's claim for breach of the implied covenant relies on precisely the conduct complained of in the breach of

contract claim.  The implied covenant claim should therefore be dismissed.

> 6.  <u>Attorneys' Fees</u>

The Bankruptcy Court denied SAI Trust's request for attorneys' fees at the hearing on this matter, before it issued its memorandum decision denying SAI Trust's motion for summary judgment and granting Calpine's application for summary adjudication.  Section 9.3 of the Agreement for Purchase provides that the prevailing party shall recover its "attorneys' fees and other costs incurred" in "any legal action ... brought for the enforcement" of the Agreement for Purchase.  (A-1064.)  Because the Court has determined that Calpine has breached the Agreement for Purchase such that SAI Trust should be granted summary judgment and Calpine should be denied summary adjudication on the issue of the use of the Allocated Expenses line item, SAI Trust is entitled to attorneys' fees and other costs with respect to the litigation of this issue.  The Bankruptcy Court's ruling on attorneys' fees is therefore reversed.

> ## III. <u>ORDER</u>

For the reasons stated above, it is hereby

**ORDERED** that the order of the Bankruptcy Court dated September 30, 2008, based on its decision dated September 26, 2008 granting the motion of the Reorganized Debtors

("Calpine") for summary adjudication disallowing claims numbered 6309, 6314, 6315, 6316, 6327, and 6328 filed by Robert Membreno, as trustee of SAI Trust ("SAI Trust"), denying the motion of SAI Trust for summary judgment on those Proofs of Claim, and disallowing and expunging those claims, is REVERSED as to the finding that Calpine did not breach the Agreement for Purchase, the rejection of SAI Trust's damages claim for that breach, and the ruling denying SAI Trust's request for attorneys' fees; and is AFFIRMED as to the finding that SAI Trust did not prove any damages proximately caused by Calpine's failure to provide certified Net Profits Interest statements. It is further

ORDERED that the action is remanded to the Bankruptcy Court for further proceedings consistent with this opinion, including the dismissal of the claim for breach of the implied covenant of good faith and fair dealing, and a determination and award of damages and attorneys' fees.

The Clerk of the Court is directed to withdraw any pending motions and to close this case.

SO ORDERED.

Dated:     New York, New York
           9 June 2009

                              Victor Marrero
                                 U.S.D.J.

29